Ct. No. 25-00156

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

| |
|---|
| CATFISH FARMERS OF AMERICA, *et al.*, |
|                               Plaintiffs, |
|         v. |
| UNITED STATES, |
|                               Defendant, |
|         and |
| CAN THO IMPORT EXPORT SEAFOOD JOINT STOCK COMPANY, and NTSF SEAFOODS JOINT STOCK COMPANY, |
|                               Defendant-Intervenors. |

Before: Hon. Richard K. Eaton, Judge

Court No. 25-00156

**RULE 56.2 MOTION OF PLAINTIFFS, CATFISH FARMERS OF AMERICA, *et al.*, FOR JUDGMENT ON THE AGENCY RECORD**

Pursuant to Rule 56.2 of the Rules of the United States Court of International Trade ("CIT"), Plaintiffs Catfish Farmers of America and individual U.S. catfish processors America's Catch, Inc., Alabama Catfish, LLC d/b/a Harvest Select Catfish, Inc., Consolidated Catfish Companies, LLC d/b/a Country Select Catfish, Delta Pride Catfish, Inc., Guidry's Catfish, Inc., Heartland Catfish Company, Magnolia Processing, Inc. d/b/a Pride of the Pond, and Simmons Farm Raised Catfish, Inc. (collectively, "Petitioners" or "CFA") move for judgment on the agency record regarding the final results of the 2022-2023 administrative review of the antidumping duty order, *Certain Frozen Fish Fillets From the Socialist Republic of Vietnam*, 90 Fed. Reg. 26,004 (Dep't Commerce June 18, 2025) (final results and partial rescission of admin. rev.; 2022-2023).

Ct. No. 25-00156

Specifically, Petitioners request that this Court remand the final results of the 2022-2023 administrative review to the U.S. Department of Commerce for reconsideration in accord with the instructions in the proposed order.  The arguments justifying Petitioners' motion are set forth in the accompanying opening brief.

Respectfully submitted,

*/s/ Nazak Nikakhtar*
Nazak Nikakhtar, Esq.
Stephanie M. Bell, Esq.
John Allen Riggins, Esq.

**WILEY REIN LLP**
2050 M Street, NW
Washington, DC 20036
(202) 719-7000

*Counsel to Catfish Farmers of America, et al.*

Dated: January 23, 2026

## IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| **CATFISH FARMERS OF AMERICA,** *et al.*,<br><br>                    **Plaintiffs,**<br><br>          **v.**<br><br>**UNITED STATES,**<br><br>                    **Defendant,**<br><br>          **and**<br><br>**CAN THO IMPORT EXPORT SEAFOOD JOINT STOCK COMPANY, and NTSF SEAFOODS JOINT STOCK COMPANY,**<br><br>                    **Defendant-Intervenors.** | **Before: Hon. Richard K. Eaton, Judge**<br><br>**Court No. 25-00156** |

## ORDER

Upon consideration of Plaintiffs' Rule 56.2 Motion for Judgment on the Agency Record and the accompanying opening brief, and upon all other papers filed and proceedings had herein, it is hereby

**ORDERED**, that Plaintiffs' motion is granted; and it is further

**ORDERED**, that the final results of the 2022-2023 administrative review of the antidumping duty order on certain frozen fish fillets from the Socialist Republic of Vietnam are remanded to the U.S. Department of Commerce for further consideration in accordance with this Court's opinion.

**SO ORDERED**.

Dated: _____, 2026          _____
        New York, New York                    Hon. Richard K. Eaton, Judge

NON-CONFIDENTIAL VERSION

## IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| **CATFISH FARMERS OF AMERICA,** *et al.,*<br><br>            **Plaintiffs,**<br><br>      v.<br><br>**UNITED STATES,**<br><br>            **Defendant,**<br><br>      and<br><br>**CAN THO IMPORT EXPORT SEAFOOD JOINT STOCK COMPANY, and NTSF SEAFOODS JOINT STOCK COMPANY,**<br><br>            **Defendant-Intervenors.** | **Before: Hon. Richard K. Eaton, Judge**<br><br>**Court No. 25-00156**<br><br>**<u>NON-CONFIDENTIAL VERSION</u>**<br><br>**Business Proprietary Information Removed from Pages 14-15 and 19** |

<u>**OPENING BRIEF OF PLAINTIFFS,**</u>
<u>**CATFISH FARMERS OF AMERICA,** *et al.*</u>

**Nazak Nikakhtar, Esq.**
**Stephanie M. Bell, Esq.**
**John Allen Riggins, Esq.**

**WILEY REIN LLP**
**2050 M Street, NW**
**Washington, DC 20036**
**(202) 719-7000**

*Counsel to Catfish Farmers*
*of America, et al.*

**Dated: January 23, 2026**

Ct. No. 25-00156                                          NON-CONFIDENTIAL VERSION

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ................................................................................................ 1

II.    RULE 56.2 STATEMENT ................................................................................... 1

    A.    The Administrative Determination Under Review ...................................1

    B.    Issue Presented for Review...................................................................1

III.    BACKGROUND ................................................................................................. 2

    A.    Legal Background...................................................................................2

    B.    Procedural Background...........................................................................3

IV.    STANDARD OF REVIEW ................................................................................. 5

V.    SUMMARY OF ARGUMENT ........................................................................... 6

VI.    ARGUMENT ...................................................................................................... 7

    A.    The Expected Method Was Not Feasible in This Review As a
Matter of Law ......................................................................................8

        a.    The Expected Method Requires More Than One Margin .........9

        b.    The Expected Method Requires Not Only Two Margins,
But At Least Two Distinct Values ............................................11

    B.    Bien Dong's Zero Margin Was Not Reflective of the Separate-Rate
Respondents' Dumping, Rendering its Application Unreasonable ....................12

        a.    The Separate-Rate Respondents' Operations, Costs, and
Prices Materially Distinguish Them From Bien Dong .............14

        b.    Historical Data Undermine Any Inference of Non-Dumping
By The Separate-Rate Respondents.........................................17

VII.    CONCLUSION.................................................................................................. 21

i

**NON-CONFIDENTIAL VERSION**

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

## Cases

*Agro Dutch Indus. Ltd. v. United States*,
  508 F.3d 1024 (Fed. Cir. 2007)...........................................................................11

*Albemarle Corp. & Subsidiaries v. United States*,
  821 F.3d 1345 (Fed. Cir. 2016)................................................................8, 9, 13, 16

*Altx, Inc. v. United States*,
  25 CIT 1100, 167 F. Supp. 2d 1353 (2001) ...........................................................5

*Assan Aluminyum Sanayi Ve Ticaret A.S. v. United States Aluminum Ass'n Trade*
  *Enf't Working Grp.*,
  No. 1:21-CV-00616 (SAV), 2024 WL 2044061 (Ct. Int'l Trade May 8, 2024) ...................20

*Auxin Solar, Inc. v. United States*,
  798 F. Supp. 3d 1331 (Ct. Int'l Trade 2025) ..........................................................6

*Bando Chem. Indus., Ltd. v. United States*,
  16 CIT 133, 787 F. Supp. 224 (1992), *aff'd*, 26 F. 3d 139 (Fed. Cir. 1994) ............................5

*Bosun Tools Co. v. United States*,
  No. 2021-1930, 2022 WL 94172 (Fed. Cir. Jan. 10, 2022)...............................................17, 18

*Burlington Truck Lines, Inc. v. United States*,
  371 U.S. 156 (1962).........................................................................................6

*China First Pencil Co. v. United States*,
  34 CIT 1284, 721 F. Supp. 2d 1369 (2010) ....................................................5, 6, 7

*Consol. Edison Co. v. NLRB*,
  305 U.S. 197 (1938).........................................................................................5

*Deckers Outdoor Corp. v. United States*,
  714 F.3d 1363 (Fed. Cir. 2013)..........................................................................12

*Emerson Elec. Co. v. SIPCO, LLC*,
  745 F. App'x 369 (Fed. Cir. 2018) .....................................................................17

*Fine Furniture (Shanghai) Ltd. v. United States*,
  182 F. Supp. 3d 1350 (Ct. Int'l Trade 2016) .......................................................20

*Green Farms Seafood Joint Stock Co. v. United States*,
  No. 22-00092, 2025 WL 1905115 (Ct. Int'l Trade July 10, 2025).........................16

*Grobest & I-Mei Indus. (Vietnam) Co. v. United States*,
  36 C.I.T. 98 (2012) ........................................................................................15

*Home Prods. Int'l, Inc. v. United States*,
  36 C.I.T. 665 (2012) ......................................................................................17

*Kisaan Die Tech Priv. Ltd. v. United States*,
  665 F. Supp. 3d 1364 (Ct. Int'l Trade 2023) ...............................................10

*Linyi Chengen Import and Export Co., Ltd. v. United States*,
  539 F.Supp.3d 1269 (Ct. Int'l Trade 2021) .................................................13

*Loper Bright Enters. v. Raimondo*,
  603 U.S. 369 (2024).........................................................................................6

*Matsushita Elec. Indus. Co. v. United States*,
  750 F.2d 927 (Fed. Cir. 1984).........................................................................6

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
  463 U.S. 29 (1983)...........................................................................................6

*New Am. Keg v. United States*,
  No. 20-00008, 2021 WL 1206153 (Ct. Int'l Trade Mar. 23, 2021)..............5

*PrimeSource Bldg. Prods., Inc. v. United States*,
  111 F.4th 1320 (Fed. Cir. 2024) ...............................................................9, 21

*Shanxi Hairui Trade Co. v. United States*,
  39 F.4th 1357 (Fed. Cir. 2022) .....................................................................15

*Siemens Gamesa Renewable Energy v. United States*,
  621 F. Supp. 3d 1337 (Ct. Int'l Trade 2023) ...............................................10

*Sigma Corp. v. United States*,
  117 F.3d 1401 (Fed. Cir. 1997)........................................................................2

*SKF USA Inc. v. United States*,
  630 F.3d 1365 (Fed. Cir. 2011)......................................................................20

*Solar Energy Indus. Ass'n v. United States*,
  86 F.4th 885 (Fed. Cir. 2023) .......................................................................12

*Suramerica de Aleaciones Laminadas, C.A. v. United States*,
  44 F.3d 978 (Fed. Cir. 1994)............................................................................5

*Universal Camera Corp. v. NLRB*,
  340 U.S. 474 (1951)..........................................................................................5

*Yangzhou Bestpak Gifts & Crafts Co. v. United States*,
   716 F.3d 1370 (Fed. Cir. 2013)............................................................................13

*YC Rubber Co. (N. Am.) LLC v. United States*,
   No. 2021-1489, 2022 WL 3711377 (Fed. Cir. Aug. 29, 2022) ............................10

## Statutes

19 U.S.C. § 1516a(b)(1)(B) ..................................................................................5

19 U.S.C. § 1673d(c)(5)(A) .............................................................................2, 10

19 U.S.C. § 1673d(c)(5)(B) ........................................................................ *passim*

19 U.S.C. § 1677e..............................................................................................10

## Administrative Materials

*Certain Frozen Fish Fillets from the Socialist Republic of Vietnam*,
   68 Fed. Reg. 47,909 (Dep't Commerce Aug. 12, 2003)................................ *passim*

*Certain Frozen Fish Fillets From the Socialist Republic of Vietnam*,
   90 Fed. Reg. 26,004 (Dep't Commerce June 18, 2025) ........................................1

*Certain Frozen Fish Fillets From the Socialist Republic of Vietnam*,
   89 Fed. Reg. 76,081, 76,081 & n.1 (Dep't Commerce Sep. 17, 2024)....................3

*Certain Frozen Fish Fillets From the Socialist Republic of Vietnam*,
   89 Fed. Reg. 18,595 (Dep't Commerce Mar. 14, 2024) .....................................19

*Initiation of Antidumping and Countervailing Duty Administrative Reviews*,
   88 Fed. Reg. 71,829 (Dep't Commerce Oct. 18, 2023) ........................................3

## Other Authorities

Uruguay Round Agreements Act, Statement of Administrative Action, H.R. Doc.
   No. 103-316, vol. 1 (1994), reprinted in 1994 U.S.C.C.A.N. 4040, 4201...................... *passim*

## I.     INTRODUCTION

Plaintiffs Catfish Farmers of America and individual U.S. catfish processors America's Catch, Inc., Alabama Catfish, LLC d/b/a Harvest Select Catfish, Inc., Consolidated Catfish Companies, LLC d/b/a Country Select Catfish, Delta Pride Catfish, Inc., Guidry's Catfish, Inc., Heartland Catfish Company, Magnolia Processing, Inc. d/b/a Pride of the Pond, and Simmons Farm Raised Catfish, Inc. (collectively, "Petitioners" or "CFA") respectfully submit this opening brief in support of their motion for judgment on the agency record with respect to the final results issued by the U.S. Department of Commerce ("Commerce") in the 2022-2023 administrative review of the antidumping duty order on frozen fish fillets from the Socialist Republic of Vietnam ("Vietnam").

## II.     RULE 56.2 STATEMENT

### A.     The Administrative Determination Under Review

The administrative determination subject to this appeal is *Certain Frozen Fish Fillets From the Socialist Republic of Vietnam*, 90 Fed. Reg. 26,004 (Dep't Commerce June 18, 2025) (final results and partial rescission of admin. rev.; 2022-2023), P.R. 490 ("Final Results") and the accompanying Issues and Decision Memorandum, P.R. 488 ("IDM").

### B.     Issue Presented for Review

This appeal raises the following issues:

(1)     Whether the "expected method" for calculating separate rates for non-individually-examined respondents under 19 U.S.C. § 1673d(c)(5)(B), as elaborated on in the Statement of Administrative Action Accompanying the Uruguay Round Agreements Act ("SAA"), is feasible when Commerce individually examines a single respondent, precluding any averaging of calculated dumping margins.

(2)    Whether Commerce's decision to infer that all non-examined companies in this administrative review were not dumping, and therefore warranted a $0.00/kg margin, was unsupported by substantial evidence and contrary to law.

## III.    **BACKGROUND**

### A.    **Legal Background**

Commerce employs a rebuttable presumption that all companies within a nonmarket economy are government-controlled and should be assigned a single "country-wide" entity rate, unless such companies affirmatively demonstrate their independence from the government.  *See Sigma Corp. v. United States*, 117 F.3d 1401, 1405–07 (Fed. Cir. 1997).   Companies that demonstrate independence receive a "separate rate," which is normally the "weighted average of the estimated weighted average dumping margins established for exporters and producers individually investigated, excluding any zero and de minimis margins" and margins determined entirely on the basis of facts otherwise available ("AFA").  19 U.S.C. § 1673d(c)(5)(A).  However, where all investigated respondents received a zero, de minimis, or entirely AFA rate, Commerce "may use any reasonable method to establish the estimated all-others rate," "including averaging the estimated weighted average dumping margins determined for the exporters and producers individually investigated."  *Id.* § 1673d(c)(5)(B).

The SAA explains that the "expected method" in this scenario will be "to weight-average the zero and de minimis margins and margins determined pursuant to the facts available, provided that volume data is available."  Uruguay Round Agreements Act, Statement of Administrative Action, H.R. Doc. No. 103-316, vol. 1, at 873 (1994), reprinted in 1994 U.S.C.C.A.N. 4040, 4201. But if the "expected method" is "not feasible," or if it will "result{} in an average that would not

be reasonably reflective of potential dumping margins for non-investigated exporters or producers," Commerce may instead "use other reasonable methods." *Id.*

### B.    Procedural Background

On August 12, 2003, Commerce published the antidumping duty order on fish fillets from Vietnam. *See Certain Frozen Fish Fillets from the Socialist Republic of Vietnam*, 68 Fed. Reg. 47,909 (Dep't Commerce Aug. 12, 2003) (notice of antidumping duty order) (the "Order"). On October 18, 2023, Commerce initiated the underlying administrative review of the Order for the period from August 1, 2022, through July 31, 2023 (the "POR"). *See Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 88 Fed. Reg. 71,829 (Dep't Commerce Oct. 18, 2023), P.R. 34. The review covered 151 exporters, from which Commerce selected two mandatory respondents: (1) Bien Dong Seafood Joint Stock Company and certain affiliates (collectively "Bien Dong") and (2) Vinh Hoan Corporation and certain affiliates (collectively "Vinh Hoan"). *See Certain Frozen Fish Fillets From the Socialist Republic of Vietnam*, 89 Fed. Reg. 76,081, 76,081 & n.1 (Dep't Commerce Sep. 17, 2024) (prelim. results of antidumping duty admin. rev. and rescission of admin. rev., in part; 2022-2023), P.R. 411 ("Preliminary Results") and accompanying Preliminary Decision Memorandum, P.R. 399 ("PDM") at 1–2.

On September 17, 2024, Commerce published the Preliminary Results of its review. *See* Preliminary Results and PDM. Commerce preliminarily calculated weighted-average dumping margins of zero dollars per kilogram for both mandatory respondents, Bien Dong and Vinh Hoan. *See* PDM at 12. And it preliminarily found six entities eligible to receive a separate rate: Can Tho Import Export Seafood Joint Stock Company ("CASEAMEX"), Dai Thanh Seafoods Company Limited ("Dai Thanh"), Dong A Seafood One Member Company Limited ("Dong A"), HungCa 6 Corporation ("HungCa 6"), Nam Viet Corporation ("Navico"), and NTSF Seafoods Joint Stock

Company ("NTSF").  *Id.* at 11.  Having calculated zero margins for both mandatory respondents, Commerce preliminarily determined that a reasonable method for assigning a dumping margin to the separate-rate respondents was to "assign the $0.00/kg dumping margin calculated for the mandatory respondents" pursuant to the expected method under 19 U.S.C. § 1673d(c)(5)(B).  *Id.* at 12.  In support, Commerce stated that it had "not determined that use of the expected method is not feasible, and there is no evidence that the $0.00/kg dumping margin is not reasonably reflective of the non-examined separate-rate respondents' potential dumping margins."  *Id.*

On January 17, 2025, after Commerce issued its Preliminary Results, Commerce revoked the Order with respect to mandatory respondent Vinh Hoan and rescinded its review of that company.  IDM at 2.  Petitioners submitted briefing contesting Commerce's preliminary findings and explaining that Commerce's decision to apply the mandatory respondents' $0.00 rate to the separate rate respondents was unreasonable based on record evidence of the mandatory respondents' differing operations and pricing. *See generally* Letter from Wiley Rein LLP to Sec'y Commerce, re: *Certain Frozen Fish Fillets from the Socialist Republic of Vietnam: Case Brief* (Feb. 14, 2025) at 3-11, C.R. 472-473, P.R. 468 ("Case Br.").  Petitioners also explained that Commerce's $0.00 rate was unreasonable in light of persistent and sustained dumping throughout the history of this antidumping duty order.  *See generally id.* at 11-14.  When Commerce issued its Final Results on June 13, 2025, however, it individually examined – and thus calculated an individual margin for – just Bien Dong.  *See* IDM at 16.  Commerce continued to assign Bien Dong a weighted-average dumping margin of zero dollars per kilogram.  *Id.* at 8.  And Commerce also continued to assign the separate-rate respondents the $0.00 rate established for Bien Dong, finding no reason "justifying a deviation from the expected method."  *See id.* at 13.  This appeal followed.

NON-CONFIDENTIAL VERSION

## IV.   STANDARD OF REVIEW

This Court will "hold unlawful any determination, finding, or conclusion found . . . to be unsupported by substantial evidence on the record, or otherwise not in accordance with law."  19 U.S.C. § 1516a(b)(1)(B).

Substantial evidence "is more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477 (1951) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). Substantial evidence is measured by the entire record, and Commerce "must take into account whatever in the record fairly detracts from its weight," including "contradictory evidence or evidence from which conflicting inferences could be drawn."  *Suramerica de Aleaciones Laminadas, C.A. v. United States*, 44 F.3d 978, 985 (Fed. Cir. 1994) (quotations omitted).  "{I}t is not enough for Commerce simply to 'determine' . . . that the record does not support a particular conclusion without addressing the evidence both in support of and in derogation of that conclusion, and it is likewise not enough for Commerce to 'continue to find' something that is unsupported by a discussion of the evidence in the first instance."  *New Am. Keg v. United States*, No. 20-00008, 2021 WL 1206153, at *18 (Ct. Int'l Trade Mar. 23, 2021).  Thus, although Commerce need not address every single piece of evidence, "it must address significant arguments and evidence which seriously undermines its reasoning and conclusions."  *Altx, Inc. v. United States*, 25 CIT 1100, 1117, 167 F. Supp. 2d 1353, 1374 (2001).

Commerce "may not act arbitrarily in reaching its decision{.}" *China First Pencil Co. v. United States*, 34 CIT 1284, 1290, 721 F. Supp. 2d 1369, 1375 (2010) (quotations omitted).  Its determinations "must have a reviewable, reasoned basis" to be affirmed.  *Bando Chem. Indus., Ltd. v. United States*, 16 CIT 133, 136, 787 F. Supp. 224, 227 (1992), *a'f'd*, 26 F. 3d 139 (Fed. Cir.

1994).  To satisfy that standard, "the agency must examine the relevant data and articulate a

satisfactory explanation for its action including a 'rational connection between the facts found and

the choice made.'"  *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43

(1983) (quoting *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962)).  From

that explanation, the Court must determine whether the evidence and reasonable inferences from

the record support Commerce's findings.  *Matsushita Elec. Indus. Co. v. United States*, 750 F.2d

927, 933 (Fed. Cir. 1984).

Finally, "{i}n agency cases, courts will analyze the meaning of statutes using 'the

traditional tools of statutory construction.'"  *Auxin Solar, Inc. v. United States*, 798 F. Supp. 3d

1331, 1338 (Ct. Int'l Trade 2025) (quoting *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 403

(2024)).  "It is 'the proper and peculiar province of the courts' to determine independently the best

reading of a statute."  *Id.* (quoting *Loper Bright*, 603 U.S. at 385).

## V.    SUMMARY OF ARGUMENT

Commerce's determination to assign the separate-rate respondents a zero margin was

unlawful and unsupported by substantial evidence for two independent reasons.

*First*, the "expected method" for calculating a separate rate when all individually-examined

respondent margins are zero is "to weight-average the zero and de minimis margins and margins

determined pursuant to the facts available{.}"  SAA at 873.  Here, the expected method

definitionally could not apply because the underlying review yielded only one calculated margin.

After Commerce revoked the Order and rescinded the underlying review with respect to Vinh

Hoan, the agency was left with only one mandatory respondent.  Because the plain language of the

expected method requires Commerce to "weight-average" calculated margins, *id.*, and it is not

possible to average a single value, the expected method was "not feasible" on its face, *see id.*

Moreover, by requiring weight-averaging between zero "and" a different value, the SAA makes plain that Commerce cannot "weight-average" one zero with another. Thus, the Court should clarify as a matter of statutory construction that the expected method cannot apply to a review like this one yielding a single dumping margin or a margin comprised of two zero rates. Indeed, Commerce's improper interpretation of the statute and SAA resulted in Commerce jumping to the unreasonable conclusion that separate rate companies were not dumping, despite the long history of dumping margins calculated in reviews of this antidumping duty order.

*Second*, for a number of reasons explained in Petitioners' case brief and reiterated below, Commerce's application of the expected method "result{ed} in an average that would not be reasonably reflective of potential dumping margins for non-investigated exporters or producers." *Id.* Among other reasons, (i) Bien Dong's operations and pricing behaviors differed from the separate-rate respondents' in ways that rendered Bien Dong's dumping margin unrepresentative; and (ii) the historical margins applied to the separate-rate respondents in 14 of the last 15 administrative reviews independently demonstrate that a zero margin is not appropriate. As such, Commerce's determination to assign the separate-rate respondents a zero margin was arbitrary and unsupported by substantial evidence.

## VI.    <u>ARGUMENT</u>

For the reasons below, Commerce erred in assigning the separate-rate respondents a zero margin, purportedly pursuant to 19 U.S.C. § 1673d(c)(5)(B). *See* IDM at 12. *First*, the expected method for calculating a separate rate under 19 U.S.C. § 1673d(c)(5)(B) is not feasible where Commerce calculates a single individual margin, incapable of being averaged. *Second*, overwhelming record evidence regarding the separate-rate respondents' operations, pricing

behaviors, and historical margins demonstrated that a zero margin is not reasonably reflective of their potential dumping.

### A.    The Expected Method Was Not Feasible in This Review As a Matter of Law

As summarized above, when an administrative review yields margins for individually-examined respondents that are exclusively zero, de minimis, or the result of AFA, Commerce "may use any reasonable method to establish the estimated all-others rate . . . , including averaging the estimated weighted average dumping margins determined for the exporters and producers individually investigated."  19 U.S.C. § 1673d(c)(5)(B).  The SAA elaborates that the "expected method" in that scenario will be "to weight-average the zero and de minimis margins and margins determined pursuant to the facts available, provided that volume data is available."  SAA at 873.  However, if the expected method is "not feasible," or if the method "results in an average that would not be reasonably reflective of potential dumping margins for non-investigated exporters or producers," Commerce may instead "use other reasonable methods."  *Id.*

In construing the SAA, the Federal Circuit has held that, where all individually examined respondents in an administrative review receive zero, de minimis, or AFA rates, the expected method for calculating a separate rate presumptively will apply.  *See Albemarle Corp. & Subsidiaries v. United States*, 821 F.3d 1345, 1349, 1352 (Fed. Cir. 2016) ("The SAA thus makes clear that under the statute, when all individually examined respondents are assigned de minimis margins, Commerce is expected to calculate the separate rate by taking the average of those margins.").  In such cases, the Federal Circuit places the burden on Commerce to justify departure from the expected method.  *Id.* at 1353 (holding "Commerce must find based on substantial evidence that there is a reasonable basis for concluding that the separate respondents' dumping is different" to depart from the "expected method").  Commerce, in turn, places the burden on the

party seeking to depart from the expected method to prove it is infeasible or unrepresentative. IDM at 13 ("In terms of deviating from this court-affirmed practice, we note that the courts have confirmed that the burden of proof lies with the party seeking to depart from the expected method (or with Commerce as the case may be)." (quotation omitted)); *see also PrimeSource Bldg. Prods., Inc. v. United States*, 111 F.4th 1320, 1330 (Fed. Cir. 2024) ("{W}hen Commerce applies the expected method, the party that desires Commerce to deviate from the expected method bears the burden to identify and present substantial evidence on the record that either the expected method was 'not feasible' or produced results not 'reasonably reflective of potential dumping margins for non-investigated exporters or producers.'").

### a.    The Expected Method Requires More Than One Margin

In this review, applying *Albemarle* and agency practice, Commerce stated it was preliminarily employing the expected method by averaging the zero margins it calculated for individual respondents Bien Dong and Vinh Hoan. PDM at 12. But after issuing the Preliminary Results, Commerce revoked the Order with respect to Vinh Hoan and rescinded its review of that respondent. *See* Final Results at n.8. Accordingly, when Commerce issued the Final Results, this administrative review involved just one individually-examined respondent and dumping margin. Nonetheless, in calculating a final separate rate, Commerce purportedly continued to apply the expected method, and it continued to place the burden on Petitioners to demonstrate why the expected method should not apply. *See id.* at 12–14 ("In the *Preliminary Results*, Commerce applied its standard practice by applying the mandatory respondents' rates to the separate rate companies. . . . {W}e do not find that the petitioners' analysis justifies a departure from the expected method{.}"). Because Commerce could not, and thus did not, apply the expected method in the Final Results of this review, that determination was legal error.

As a matter of statutory construction, the expected method cannot be applied in a review with a single individually-examined respondent.  The plain language of the SAA provides that the expected method for calculating a separate rate is to "weight-average" the margins calculated for individually-examined respondents.  SAA at 873.  It is axiomatic that calculating an average requires more than a single input value, as the Court has previously observed in comparable circumstances:

> An obvious flaw in the Department's analysis is that <u>Commerce did not actually apply the "expected method" described in the SAA</u>.  Commerce did not "weight average," let alone average, anything in determining its all-others rate. <u>"Averaging" necessarily involves the situations of different exporters and thus rests on a wider data base than does use of only one margin</u>.  But the Department's selection of only one respondent for individual examination (which itself was unlawful, as discussed above) left it with only one margin, and thus no averaging of any kind was possible.

*Kisaan Die Tech Priv. Ltd. v. United States*, 665 F. Supp. 3d 1364, 1381 (Ct. Int'l Trade 2023) (Stanceu, J.) (emphasis added); *see also Siemens Gamesa Renewable Energy v. United States*, 621 F. Supp. 3d 1337, 1346 (Ct. Int'l Trade 2023) (remanding all-others rate: "Commerce put itself in a position under which it could not apply this general rule.  Having relied upon 'total AFA' under 19 U.S.C. § 1677e to determine a margin for Vestas Eolica, the only exporter or producer it selected for individual investigation, Commerce had no estimated weighted average dumping margins that it could average according to § 1673d(c)(5)(A).  Therefore, the agency left itself only with the 'exception' to the general rule{.}"); *cf. YC Rubber Co. (N. Am.) LLC v. United States,* No. 2021-1489, 2022 WL 3711377, at *4 (Fed. Cir. Aug. 29, 2022) (same: "Commerce must 'determine the weighted average' for that reasonable number, and Commerce provides no reason why it would be reasonable to 'average' a single rate.").

Consistent with these judicial precedents, and the plain language of the SAA, the expected method was "not feasible" as a matter of law in this review.  *See* SAA at 873.  Commerce's

purported application of the expected method – and burden-shifting to Petitioners to demonstrate why it should not apply – should thus be remanded with instructions to use "other reasonable methods" for calculating the separate-rate respondents' dumping margins in the first instance. *See id.* (providing that if the expected method is "not feasible," Commerce may instead use "other reasonable methods"); *see also Agro Dutch Indus. Ltd. v. United States*, 508 F.3d 1024, 1029 (Fed. Cir. 2007) (holding that, if "'{s}tatutory construction alone' is sufficient to resolve the merits of {an} argument," the argument "implicates a pure question of law" and "can be addressed on appeal" regardless of administrative exhaustion). In fact, Petitioners provided Commerce a reasonable method for assessing the separate rate based on the record of this proceeding and the history of the case (*i.e.*, "pulling forward" the $0.18 rate Commerce assigned to separate rate respondents in the prior review). *See* Case Br. at 14.

### b.    The Expected Method Requires Not Only Two Margins, But At Least Two Distinct Values

To the extent Commerce purported to average two zero values, Commerce's determination is also inconsistent with the statute. The SAA states that the "expected" method is "to weight-average the zero <u>and</u> de minimis margins and margins determined pursuant to the facts available, provided that volume data is available." SAA at 873 (emphasis added). The wording of the SAA – in particular the placement of the word "and" – establishes that "zero" must be weight averaged with something else, not just the same number, another zero. This makes sense, as a <u>weighted</u> average necessarily means an average of two distinct numbers. Again, the intentional placement of the word "and" by Congress underscores this point without any ambiguity.

An important tenet of statutory construction, which applies to the SAA, is the rule against surplusage – *i.e.*, that Congress's language must be interpreted to "to give effect, if possible, to every clause and word of a statute" such that "no party will be inoperative, void or insignificant."

*Deckers Outdoor Corp. v. United States*, 714 F.3d 1363, 1367 (Fed. Cir. 2013) (quotations omitted). Therefore, the inclusion of the word "and" in the SAA must be understood as intentional. Furthermore, the plain-meaning rule of statutory construction requires that statutory language be given its plain, ordinary, and common usage. *See, e.g.*, *Solar Energy Indus. Ass'n v. United States*, 86 F.4th 885, 895 (Fed. Cir. 2023), *adhered to on reh'g*, 111 F.4th 1349 (Fed. Cir. 2024). In this instance, an "average" necessarily means, by definition, a formulation using two distinct numbers. Hence, Congress's choice of words in the SAA expressly prohibits averaging two "zero" rates as the "expected method." As a result, the expected method is not possible or permitted here.

In short, Commerce ignored the law, the SAA, the rules of statutory construction, and record evidence (as illustrated below) in determining final margins for non-mandatory respondents in this proceeding.

### B. Bien Dong's Zero Margin Was Not Reflective of the Separate-Rate Respondents' Dumping, Rendering its Application Unreasonable

The SAA also instructs that if the expected method "is not feasible, or results in an average that would not be reasonably reflective of potential dumping margins for non-{reviewed} exporters or producers, Commerce may use other reasonable methods." SAA at 873. This is the case before the Court now. There is extensive history of consistent and unrelenting dumping (and resulting injury) in this proceeding that spans over two decades. In light of this fact, it is inappropriate – and patently "unreasonable" – for Commerce to infer from two zero dumping margins that the entire Vietnamese exporter industry is, all of a sudden, not dumping product into the United States. This inference is arbitrary; nothing on the record supports this conclusion, and Commerce has pointed to no such evidence.

To the contrary, CFA pointed to evidence during the underlying review explaining that the mandatory respondents' cost and operational structures differed from those of the non-mandatory

respondents, such that Commerce needed to probe the differences further to estimate the best separate rate for these companies. Case Br. at 5–9. CFA additionally proposed questions that Commerce could pose to the non-mandatory companies to examine this issue while also limiting Commerce's burden. *See id.* at 9 n.36. Commerce, however, refused to ask any questions. CFA then pointed to the non-mandatory respondents' record prices – which were below mandatory respondents' prices – as evidence that the non-mandatory exporters are very likely dumping. *Id.* at 9–11. But again, Commerce refused to probe this issue at all. CFA then reminded Commerce that, as a matter of practice, the agency does not automatically assign the mandatory respondents' zero rate to the non-mandatory companies, but rather looks to reasonable information to estimate the best margin. *See id.* at 4–5, 15–18; *see also Linyi Chengen Import and Export Co., Ltd. v. United States*, 539 F.Supp.3d 1269, 1276 (Ct. Int'l Trade 2021). Commerce again ignored these facts. And finally CFA underscored, by pointing to historical margins in this proceeding, that the Vietnamese industry as a whole has been consistently and systematically dumping subject fillets into the United States, notwithstanding the behavior of the two largest mandatory respondents in the instant review. Case Br. at 11–14. In light of this reality, CFA demonstrated that it was unjustified and "unreasonable" (using the statute's own wording) to infer that the Vietnamese industry as a whole suddenly stopped dumping product into the United States. Commerce also ignored this fact.

The Federal Circuit has explained that "accuracy and fairness must be Commerce's primary objectives in calculating a separate rate for cooperating exporters." *Albemarle*, 821 F.3d at 1354. Thus, while a mandatory respondent's margin <u>may be</u> reasonably reflective of separate-rate respondents' dumping, that is not necessarily the case, as both Commerce and the courts have previously found. *See, e.g.*, *Yangzhou Bestpak Gifts & Crafts Co. v. United States*, 716 F.3d 1370,

BUSINESS PROPRIETARY INFORMATION
HAS BEEN DELETED

1378 (Fed. Cir. 2013) (finding average of mandatory respondents' margins "unreasonable as applied" and "a lack of substantial evidence showing that such a determination reflects economic reality"). Here, substantial record evidence demonstrated that Bien Dong's zero margin was not reasonably reflective of the separate-rate respondents' potential dumping for many reasons.

> **a.    The Separate-Rate Respondents' Operations, Costs, and Prices Materially Distinguish Them From Bien Dong**

Record evidence showed that any inference that Bien Dong's zero dumping margin reasonably reflected non-dumping by the separate-rate respondents was unsupported. Petitioners explained in their case brief that, for five of the separate-rate respondents, [

].

Case Br. at 10 & Exh. 1B. Notably, even the [

]. *Id.* As such, it is plain that the separate-rate respondents' USPs [                    ] than Bien Dong's.

The [            ] differences in pricing behavior between Bien Dong and the separate-rate respondents follow logically from differences in the companies' selling channels and operations. Indeed, there is a significant gulf in the operations of Bien Dong and the separate-rate respondents. Bien Dong owns farms and processing facilities, for which [                    ]. *Id.* at 8. And it [                    ]. *Id.* Its [                    ] operations thus allow it to manufacture subject merchandise with different efficiencies relative to smaller and/or less integrated companies, many of which must purchase fish inputs from non-related suppliers. For example, a company that [

]. *Id.* at 9. Large integrated companies can also create cost efficiencies by reintroducing

BUSINESS PROPRIETARY INFORMATION
HAS BEEN DELETED     NON-CONFIDENTIAL VERSION

byproducts back into their production processes.  *Id.* at 7.  By contrast, CASEAMEX, Dai Thanh, HungCa 6, and Dong A did not report either having affiliated U.S. entities or making sales to affiliated entities.  *Id.* at 8–9; *cf. Grobest & I-Mei Indus. (Vietnam) Co. v. United States*, 36 C.I.T. 98, 109 (2012) ("Fine Foods, unlike the mandatory respondents in this review, is vertically integrated.  This is sufficient reason for Commerce to determine that Fine Foods' production experience is less representative of respondents' production experience{.}" (quotation and alterations omitted)).

Further, Bien Dong fundamentally differs from the separate-rate respondents because of its market share and size.  At the outset of the review, Bien Dong accounted for [      ]% of all entries during the POR.  By contrast, [

] during the POR, and represented [                              ] individually.  Case Br. at 5. [                                              ] are also small market participants, having represented just [    ]%, [    ]%, and [    ]% of total entries, respectively.  *Id.* at 6.  Given their market positions – and the unlikelihood of being selected for individual examination – the separate-rate respondents plainly had a greater incentive to dump in the U.S. market in order to gain a foothold and compete with companies with a significantly greater presence.  *See, e.g.*, *Shanxi Hairui Trade Co. v. United States*, 39 F.4th 1357, 1362 (Fed. Cir. 2022) ("Commerce explained that . . . as exporters accounting for smaller volumes of subject merchandise become aware that they are effectively excluded from individual examination, they may decide to lower their prices." (quotations and alterations omitted)); *see also* Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* § 737 (4th ed. 2014) ("{I}t might be logical and necessary for a new or recent entrant to engage in below cost pricing as a means of achieving market penetration."  (citation omitted)).

Commerce overlooked or rejected these data points arbitrarily, including by erroneously asserting that the data needed to "justif{y} a departure from the expected method for the six separate rate companies" to have probative value. *See* IDM at 14. With regard to the separate-rate respondents' lower USPs, Commerce stated that "while the petitioners performed a pricing analysis between certain of the separate rate applicants and the mandatory respondents, the proper metric in analyzing dumping behavior is comparing prices to normal value, and the record contains no such comparison." *Id*. But separate-rate respondents do not submit the data necessary to calculate normal value by design. Thus, such a comparison was impossible on this record, as it would be in any review unless Commerce requested such information. Commerce may not rely on the absence of data it opted not to collect. *See, e.g.*, *Albemarle*, 821 F.3d at 1358 ("On at least one prior occasion, Commerce has reopened the administrative record and collected additional information from separate respondents when all individually examined respondents were assigned de minimis margins."). In fact, Petitioners asked Commerce to collect additional information about these companies, but Commerce declined. Letter from Wiley Rein LLP to Sec'y Commerce, re: *Certain Frozen Fish Fillets from the Socialist Republic of Vietnam: Request for Additional Information from Companies Seeking Separate Rate Treatment* (June 3, 2024), C.R. 280, P.R. 287. In any event, Commerce has previously compared sales prices (including in past reviews of the underlying Order) to assess the representativeness of individually-calculated dumping margins. *See, e.g.*, *Green Farms Seafood Joint Stock Co. v. United States*, No. 22-00092, 2025 WL 1905115, at *2 (Ct. Int'l Trade July 10, 2025) (finding separate rate "reasonably reflect{ed} economic reality" where Commerce "compared the sale price in the company's separate rate application with prices reported by {the mandatory respondents} during the period of review"). Indeed, significant

differences in pricing would reasonably reflect potential differences in dumping margins. Commerce's wholesale rejection of such an analysis here was thus arbitrary and unsupported.

With regard to the respondents' differing operations, Commerce stated in a single sentence "we disagree that the record shows markedly different operations for all of the separate rate companies." IDM at 14. That assertion was not accompanied by analysis or supporting evidence and thus was inadequately explained. *Cf. Home Prods. Int'l, Inc. v. United States*, 36 C.I.T. 665, 675–76 (2012) ("The court, though, cannot evaluate the reasonableness of Commerce's decision-making reflected in one conclusory sentence in the Decision Memorandum." (emphasis omitted)); *see also Emerson Elec. Co. v. SIPCO, LLC*, 745 F. App'x 369, 372 (Fed. Cir. 2018) (finding agency did not "adequately explain and support its conclusion" in "two conclusory sentences"). Commerce also stated that (only) two separate-rate respondents, NTSF and CASEAMEX, "have similar sales channels to the mandatory respondent." IDM at 14. Notably, however, Commerce cited the preceding administrative review for that proposition as to CASEAMEX, without acknowledging that CASEAMEX had been individually investigated in that proceeding and was found to be dumping, while Vinh Hoan was not – *i.e.*, that CASEAMEX was determined to be empirically distinguishable from larger producers. *See id.*; *see also* Case Br. at 11–12. As discussed below, that salient omission itself rendered Commerce's determination arbitrary and unsupported.

### b.    Historical Data Undermine Any Inference of Non-Dumping By The Separate-Rate Respondents

Further, historical data strongly undermine any inference of non-dumping by the separate-rate respondents. The Federal Circuit has held that, in evaluating the representativeness of a calculated rate, it is appropriate to place the rate in historical context. In *Bosun Tools*, *e.g.*, a separate-rate respondent argued the mandatory respondents' dumping rates were not reasonably

reflective of its operations and that it should instead be assigned a dumping margin of zero. *Bosun Tools Co. v. United States*, No. 2021-1930, 2022 WL 94172, at *4–6 (Fed. Cir. Jan. 10, 2022). Commerce and the Federal Circuit disagreed, in part because of the respondent's historical non-zero dumping margins. *Id.* at *6. The Federal Circuit observed that when the respondent had been individually examined in past reviews, its "individually calculated rates were all above de minimis," in addition to which the separate rates it had been assigned had generally trended up. *Id.* at *5; *id.* at *6 ("Commerce emphasized that the 0% rate was inconsistent with Bosun's individually calculated rates, which were all above de minimis."). Accordingly, Commerce determined and the Federal Circuit agreed, based on the respondent's history of dumping, that a zero rate in the pending review "was not realistic." *Id.* at *6.

The same considerations foreclose a zero separate-rate margin in this review. Out of fifteen historical administrative reviews, the separate rate respondents have received a $0.00/kg rate just once, years ago:

| SEGMENT | SEPARATE RATE |
|---------|---------------|
| AR19 | $0.18 |
| AR18 | N/A |
| AR17 | $ 1.94 |
| AR16 | $0.00 |
| AR15 | $0.15 |
| AR14 | $1.28/$1.37[1] |
| AR13 | $0.89 |
| AR12 | $0.69 |
| AR11 | $0.69 |
| AR10 | $ 0.97 |
| AR9 | $1.20 |

---

[1]    The separate rate in this review differed for various companies based on the results of a remand redetermination.

BUSINESS PROPRIETARY INFORMATION
HAS BEEN DELETED

Ct. No. 25-00156                                                    **NON-CONFIDENTIAL VERSION**

| AR8 | $1.26 |
|---|---|
| AR7 | $0.19 |
| AR6 | $0.06 |
| AR5 | $0.02 |
| AR4 | 0.52% |
| AR3 | N/A |
| AR2 | N/A |
| AR1 | N/A |
| LTFV | 45.55% |

A $0.00/kg rate – *i.e.*, an inference of <u>no</u> dumping – would therefore be a drastic departure from the dumping rates consistently assigned to the separate-rate respondents over nearly twenty years.

Historical context also demonstrates that individually-examined respondents are not necessarily representative of other participants in this market, including [                    ] separate-rate respondents in this review. In the immediately preceding administrative review, Commerce individually investigated Vinh Hoan and CASEAMEX. *See Certain Frozen Fish Fillets From the Socialist Republic of Vietnam*, 89 Fed. Reg. 18,595 (Dep't Commerce Mar. 14, 2024) (final results and partial rescission of admin. rev.; 2021-2022). Commerce calculated a $0.00/kg dumping rate for Vinh Hoan, but calculated a dumping margin of $0.18/kg for CASEAMEX and assigned CASEAMEX's $0.18/kg rate to the separate-rate respondents in that review. *Id*. at 18,596. As such, Commerce's assumption that non-dumping by the largest participants in the market suggests non-dumping by smaller participants has specifically – and very recently – been debunked. *See* Case Br. at 11–12.

Commerce failed to address that data point and argument completely. *See* IDM at 15–16. Indeed, Commerce erroneously asserted that Petitioners had "provided limited discussion relating to CASEAMEX . . . , and the record provides <u>no basis</u> to conclude that Bien Dong's rate would

not be representative of their experience." IDM at 14 (emphasis added). Commerce's (i) failure to acknowledge dumping by a separate-rate respondent, (ii) in the immediately preceding, and thus near-contemporaneous, review, (iii) confirming the largest respondents empirically do not reflect smaller producers' like CASEAMEX's potential dumping, (iv) while citing the prior review for other CASEAMEX-related data (*see supra* at 13), was arbitrary and capricious, constituted a failure to consider an important aspect of the problem, and independently warrants remand. *See, e.g.*, *Fine Furniture (Shanghai) Ltd. v. United States*, 182 F. Supp. 3d 1350, 1371 (Ct. Int'l Trade 2016), order clarified, 39 ITRD 1672 (Ct. Int'l Trade 2017) ("{W}hen a party properly raises an argument before an agency, that agency is required to address the argument in its final decision." (citing *SKF USA Inc. v. United States*, 630 F.3d 1365, 1374 (Fed. Cir. 2011)); *Assan Aluminyum Sanayi Ve Ticaret A.S. v. United States Aluminum Ass'n Trade Enf't Working Grp*., No. 1:21-CV-00616 (SAV), 2024 WL 2044061, at *10 (Ct. Int'l Trade May 8, 2024) ("Commerce failed to address Assan's argument . . . the Court has no basis on which to sustain Commerce's decision and Commerce failed to consider an important aspect of the problem").

*    *    *

At bottom, substantial evidence materially detracted from Commerce's determination that Bien Dong's zero margin should be extended to the separate-rate respondents. And Commerce's error was compounded by its consideration of the issue through the wrong lens: in weighing Petitioners' arguments that Bien Dong was not representative, Commerce erroneously assumed Petitioners' burden was to identify substantial evidence to justify departure from the expected method. *See* IDM at 13 ("Thus, the sole question concerns rate assignment: whether the record contains substantial evidence to rebut the presumption of representativeness, justifying a deviation from the expected method. We find that it does not."); *id.* at 14 ("{W}e do not find that the

**NON-CONFIDENTIAL VERSION**

petitioners' analysis justifies a departure from the expected method for the six separate rate companies.").

But the expected method could not, and did not, apply. Accordingly, Commerce erroneously heightened Petitioners' burden and need only have determined a reasonable method for calculating the separate-rate respondents' margin in the first instance. *See PrimeSource*, 111 F.4th at 1335 ("When all mandatory respondents receive a rate that is zero, de minimis, or based entirely on AFA rates, Commerce's statutory obligation is to select 'any reasonable method,' not the <u>most</u> reasonable method." (emphasis added and emphasis omitted)). Commerce's determination should be remanded for reconsideration under the appropriate statutory standard.

## VII.    <u>CONCLUSION</u>

For the reasons discussed above, Petitioners respectfully submit that the Court should remand Commerce's final results in the 2022-2023 administrative review of the Order for further consideration.

Respectfully submitted,

*/s/ Nazak Nikakhtar*
Nazak Nikakhtar, Esq.
Stephanie M. Bell, Esq.
John Allen Riggins, Esq.

**WILEY REIN LLP**
2050 M Street, NW
Washington, DC 20036
(202) 719-7000

*Counsel to Catfish Farmers
of America, et al.*

Dated: January 23, 2026

## CERTIFICATE OF COMPLIANCE

Pursuant to Chamber Procedure 2(B)(1), the undersigned certifies that this brief complies with the word limitation requirement. The word count for Opening Brief of Plaintiffs, Catfish Farmers of America, *et al.*, as computed by Wiley Rein LLP's word processing system (Microsoft Word 2021), is 6065 words.

*/s/ Nazak Nikakhtar*
(Signature of Attorney)

Nazak Nikakhtar
(Name of Attorney)

Catfish Farmers of America and individual U.S. catfish processors America's Catch, Inc., Alabama Catfish, LLC d/b/a Harvest Select Catfish, Inc., Consolidated Catfish Companies, LLC d/b/a Country Select Catfish, Delta Pride Catfish, Inc., Guidry's Catfish, Inc., Heartland Catfish Company, Magnolia Processing, Inc. d/b/a Pride of the Pond, and Simmons Farm Raised Catfish, Inc.
(Representative Of)

January 23, 2026
(Date)