NON-CONFIDENTIAL VERSION

# IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| CATFISH FARMERS OF AMERICA, *et al.*,<br><br>      Plaintiffs,<br><br>  v.<br><br>UNITED STATES,<br><br>      Defendant,<br><br>  and<br><br>CAN THO IMPORT EXPORT SEAFOOD JOINT STOCK COMPANY, and NTSF SEAFOODS JOINT STOCK COMPANY,<br><br>      Defendant-Intervenors. | Before: Hon. Richard K. Eaton, Judge<br><br>Court No. 25-00156<br><br><u>NON-CONFIDENTIAL VERSION</u><br><br>Business Proprietary Information Removed from Pages 5 and 10 |

## <u>PLAINTIFF CATFISH FARMERS OF AMERICA'S REPLY BRIEF</u>

Nazak Nikakhtar, Esq.
Stephanie M. Bell, Esq.
John Allen Riggins, Esq.

WILEY REIN LLP
2050 M Street, NW
Washington, DC 20036
(202) 719-7000

*Counsel to Catfish Farmers of America, et al.*

Dated: May 15, 2026

Ct. No. 25-00156 NON-CONFIDENTIAL VERSION

## **TABLE OF CONTENTS**

**Page**

I.    INTRODUCTION ................................................................................................... 1

II.    ARGUMENT............................................................................................................ 1

    A.    The Government's Post Hoc Rationalization for the Separate Rate Determination Is Flatly Contradicted by Commerce's Final Decision and Cannot Be Credited.................................................................................... 1

    B.    Using a Single Mandatory Respondent's Margin to Determine the Separate Rate Is In Any Event Unreasonable ......................................................... 5

    C.    Even If Using a Single Rate to Determine the All-Others Rate Could Theoretically Be Reasonable, It Was Not In These Circumstances....................... 8

III.    CONCLUSION..................................................................................................... 16

Ct. No. 25-00156                                                NON-CONFIDENTIAL VERSION

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Albemarle Corp. & Subsidiaries v. United States,*
821 F.3d 1345 (Fed. Cir. 2016)......................................................................................6, 12

*Am. Textile Mfrs. Inst., Inc. v. Donovan,*
452 U.S. 490 (1981)..............................................................................................................3

*Ass'n of the U.S., Inc. v. State Farm Mut. Assurance Co.,*
463 U.S. 29 (1983)............................................................................................................3, 9

*Bosun Tools Co. v. United States,*
2022 WL 94172 (Fed. Cir. Jan. 10, 2022) .......................................................................14

*Burlington Truck Lines, Inc. v. United States,*
371 U.S. 156 (1962)..........................................................................................................5, 9

*Catfish Farmers of America, et al., v. United States,*
Ct No. 24-00082, (Apr. 15, 2026)......................................................................................15

*Changzhou Hawd Flooring Co. v. United States,*
848 F.3d 1006 (Fed. Cir. 2017)............................................................................................6

*Dillinger France S.A. v. United States,*
589 F.Supp.3d 1252 (Ct. Int'l Trade 2022) ........................................................................5

*Emerson Elec. Co. v. SIPCO, LLC,*
745 F. App'x 369 (Fed. Cir. 2018) ......................................................................................9

*Fine Furniture (Shanghai) Ltd. v. United States,*
182 F. Supp. 3d 1350 (Ct. Int'l Trade 2016) .....................................................................15

*Green Farms Seafood Joint Stock Co. v. United States,*
2025 WL 1905115 (Ct. Int'l Trade July 10, 2025)............................................................10

*Grobest & I-Mei Indus. (Vietnam) Co., Ltd. v. United States,*
815 F.Supp.2d 1342 (Ct. Int'l Trade 2012) ......................................................................10

*Home Prods. Int'l, Inc. v. United States,*
837 F.Supp.2d 1294 (Ct. Int'l Trade 2012) ........................................................................9

*Jiangsu Senmao Bamboo & Wood Inds. Co., Ltd. v. United States,*
769 F.Supp.3d 1344 (Ct. Int'l Trade 2025) ................................................................2, 7, 8

Ct. No. 25-00156                                                    NON-CONFIDENTIAL VERSION

*Jiangsu Senmao Bamboo & Wood Indus. Co. v. United States,*
    322 F.Supp.3d 1308 (Ct. Int'l Trade 2018) ...................................................6, 7

*Pro-Team Coil Nail Enter. Inc. v. United States,*
    587 F. Supp. 3d 1364 (Ct. Int'l Trade 2022) ..............................................11, 12

*Rhone Poulenc, Inc. v. United States,*
    899 F.2d 1185 (Fed. Cir. 1990).............................................................................13

*SKF USA Inc. v. United States,*
    630 F.3d 1365 (Fed. Cir. 2011).............................................................................15

*U.H.F.C. Co. v. United States,*
    916 F.2d 689 (Fed. Cir. 1990)............................................................................3, 5

*Ultratec, Inc. v. CaptionCall, LLC,*
    872 F.3d 1267 (Fed. Cir. 2017)..............................................................................5

*Unisor Sacilor v. United States,*
    893 F.Supp. 1112 (Ct. Int'l Trade 1995) ..............................................................5

*Yangzou Bestpak Gifts & Crafts Co. v. United States,*
    716 F.3d 1370 (Fed. Cir. 2013)............................................................................13

*YC Rubber Co. (N.A.) LLC v. United States,*
    2022 WL 3711377 (Fed. Cir. Aug. 29, 2022)....................................................6, 7, 8

**Statutes**

19 U.S.C. § 1673d(c)(5)............................................................................................8

19 U.S.C. § 1673d(c)(5)(A) .......................................................................................7

19 U.S.C. § 1677b(c)(1)...........................................................................................11

**Administrative Materials**

*Certain Frozen Fish Fillets from the Socialist Republic of Vietnam,*
    90 Fed. Reg. 26,004 (Dep't Commerce June 18, 2025) (final results and
    partial recision of admin. rev.; 2022-2023) ...........................................................1

*Certain Frozen Fish Fillets from the Socialist Republic of Vietnam,*
    91 Fed. Reg. 6192, 6194 (Dep't Commerce Feb. 11, 2026) (prelim. results of
    antidumping duty admin. rev.; prelim. recission of admin. rev.; and recission
    of admin. rev., in part; 2023–2024) .....................................................................14

NON-CONFIDENTIAL VERSION

*Certain Frozen Fish Fillets From the Socialist Republic of Vietnam*,
    89 Fed. Reg. 18,595 (Dep't Commerce Mar. 14, 2024) (final results and
    partial rescission of admin. rev.; 2021-2022) ...........................................................................15

**Other Authorities**

Uruguay Round Agreements Act, Statement of Administrative Action, H.R. Doc.
    No. 103-316, vol. 1 (1994), reprinted in 1994 U.S.C.C.A.N. 4040, 4201.........................2, 4, 9

## I.    INTRODUCTION

Plaintiffs Catfish Farmers of America and individual U.S. catfish processors America's Catch, Inc., Alabama Catfish, LLC d/b/a Harvest Select Catfish, Inc., Consolidated Catfish Companies, LLC d/b/a Country Select Catfish, Delta Pride Catfish, Inc., Guidry's Catfish, Inc., Heartland Catfish Company, Magnolia Processing, Inc. d/b/a Pride of the Pond, and Simmons Farm Raised Catfish, Inc. (collectively "CFA") respectfully submit this brief in reply to the responses filed by Defendant the United States ("Defendant"), Defendant-Intervenor Can Tho Import Export Seafood Joint Stock Company ("CASEAMEX"), and Defendant-Intervenor NTSF Seafoods Joint Stock Company ("NTSF").  *See* Def.'s Opp'n Resp. to Pl.'s Mot. for J. upon the Agency R. (Apr. 3, 2026), ECF No. 40-41 ("Def. Resp."); CASEAMEX Resp. in Opp. to Pl.'s Mot. for J. on the Agency R. (Apr. 17. 2026), ECF No. 43 ("CASEAMEX Resp."); Resp. of NTSF in Opp. to Pl.'s Mot. for J. on the Agency R. (Apr. 17, 2026), ECF No. 44 ("NTSF Resp.").[1]

## II.    ARGUMENT

### A.    The Government's Post Hoc Rationalization for the Separate Rate Determination Is Flatly Contradicted by Commerce's Final Decision and Cannot Be Credited

In its Final Decision, Commerce clearly articulated how it determined the separate rate for the separate rate companies, unequivocally and repeatedly stating that "the expected method applied here."  *Certain Frozen Fish Fillets from the Socialist Republic of Vietnam*, 90 Fed. Reg. 26,004 (Dep't Commerce June 18, 2025) (final results and partial recision of admin. rev.; 2022-2023), P.R. 490 and accompanying Issues and Decision Memorandum, P.R. 488 ("IDM") at 15; *see also id.* at 12, 13, 14.  In its Opening Brief, CFA argued that Commerce's separate rate

---

[1]    NTSF incorporates by reference the response and arguments made by the United States and CASEAMEX.  NTSF Resp. at 1.  Accordingly, CFA responds to the arguments raised by NTSF by responding to the arguments made by the United States and CASEAMEX.

determination was obviously flawed, necessitating remand. In this regard, CFA explained that the expected method requires Commerce "to weight-average the zero and de minimis margins and margins determined pursuant to the facts available{.}" Pl.'s Mot. for J. on the Agency R. (Jan. 23, 2026), ECF No. 35-36, at 6 ("Pl.'s Opening Br.") (quoting Statement of Administrative Action Accompanying the Uruguay Round Agreements Act ("SAA"), H.R. Doc. No. 103-316, vol. 1, at 873 (1994), reprinted in 1994 U.S.C.C.A.N. 4040, 4201). Because the underlying review here yielded only one mandatory respondent, the expected method "definitionally could not apply." *Id.* at 6, 8-11. In response, the Government agrees (as it must) that the expected method "is not feasible when Commerce reviews a single mandatory respondent." Def. Resp. at 11. CASEAMEX adopts and reiterates this position. CASEAMEX Resp. at 4. But instead of admitting Commerce's error and seeking a voluntary remand, the Government attempts to rewrite Commerce's final decision. *See Jiangsu Senmao Bamboo & Wood Inds. Co., Ltd. v. United States*, 769 F.Supp.3d 1344, 1359 (Ct. Int'l Trade 2025) (expressing disappointment that Commerce allowed its error "to fester" and noting that "this time, and all of these resources could have bene put to better use had Commerce simply accepted at the outset the error that it made").

Notwithstanding Commerce's statements that the "expected method applied here," IDM at 15, the Government and CASEAMEX concede that "Commerce *did not apply the expected method*" at all. Def. Resp. at 9 (emphasis added); *see also* CASEAMEX Resp. at 4. Both the Government and CASEAMEX then attempt to sidestep the clear disconnect between Commerce's articulation of its decision and their own, stating that Commerce "applied 'any reasonable method' by assigning Bien Dong's rate to the non-selected companies." Def. Resp. at 9; CASEAMEX Resp. at 4-5 ("Commerce actually relied upon the alternative 'any reasonable method'{.}"). Both

2

then go on to argue at length as to why this method was, in fact, reasonable. Def. Resp. at 11-13; CASEAMEX Resp. 5-6.

"The short—and sufficient—answer to {their} submission{s}" on this point is "that the courts may not accept appellate counsel's *post hoc* rationalizations for agency action. It is well-established that an agency's action must be upheld, if at all, on the basis articulated by the agency itself." *Motor Vehicles Mfrs.' Ass'n of the U.S., Inc. v. State Farm Mut. Assurance Co.*, 463 U.S. 29, 50 (1983); *see also Am. Textile Mfrs. Inst., Inc. v. Donovan*, 452 U.S. 490, 539 (1981) ("Whether these arguments have any merit, and they very well may, the *post hoc* rationalizations of the agency or the parties to the litigation cannot serve as a sufficient predicate for agency action."). Here, Commerce repeatedly stated that it applied the expected method, actively rejecting arguments that it should (and indeed, had to) depart from it. *See* IDM at 13 ("the burden of proof lies with the party seeking to depart from the expected method"); *id.* (the "sole question" is whether substantial evidence rebuts the "presumption of representativeness justifying a deviation from the expected method. We find that it does not."); *id.* at 14 ("{M}ore fundamentally, we do not find that the petitioners' analysis justifies a departure from the expected method for the six separate rate companies."); *id.* at 15 ("There is no basis to assume . . . that the *expected method applied here* was not reasonably reflective of the dumping margin." (emphasis added)).

The Court is "constrained to apply the applicable standard of review" to the rationale "put forth by the agency for its action." *U.H.F.C. Co. v. United States*, 916 F.2d 689, 699-700 (Fed. Cir. 1990). Here, the agency explained that it was using the expected method. This explanation was unreasonable on its face, because (as the Government and CASEAMEX alike concede) Commerce could not, as a matter of simple logic, apply the expected method where there was only one mandatory respondent. Def. Resp. at 11; CASEAMEX Resp. at 4.

The Government nevertheless attempts to overcome this foundational flaw by arguing that while the agency's decision memorandum "contains imprecise language to the extent it implies that Commerce intended to apply the expected method . . . Commerce's separate rate selection is readily discernible" and so should be upheld. Def. Resp. at 10. CFA agrees that Commerce's selection methodology is "readily discernible." *Id.* Indeed, Commerce was crystal clear: "*the expected method applied here*." IDM at 15 (emphasis added). CASEAMEX nonetheless argues that Commerce "never stated it was using a 'weighted-average' to determine" the separate rate. CASEAMEX Resp. at 5. But this argument fails to recognize that, in repeatedly stating that the expected method applied and was being implemented, Commerce necessarily indicated that it was using a weighted-average to determine separate rates, because that is what the expected method is. SAA, 1994 U.S.C.C.A.N. at 4201 ("{T}he expected method . . . will be to weight average the zero and de minimis margins and margins determined pursuant to the facts available.").

Commerce was also crystal clear that it applied the expected method because that method is presumptively reasonable. *See* IDM at 12-13. This presumption as to the expected method's reasonableness was thus the lens through which Commerce assessed the entire record. Specifically, Commerce emphasized that CFA bore "the burden of proof" in seeking "to depart from the expected method," and concluded that the record did not contain a sufficient basis to "justif{y} a deviation from the expected method." *Id.* Even construing the agency's articulation in the best possible light, Commerce's decision rests on the assumption that, in applying Bien Dong's rate to the separate companies, the agency applied the expected method without deviation or departure. If that assumption was wrong—and the Government and CASEAMEX concede that it was—Commerce's decision falls apart.

BUSINESS PROPRIETARY INFORMATION
HAS BEEN REMOVED

Ct. No. 25-00156                                                    NON-CONFIDENTIAL VERSION

Whether Commerce's misapplication of the expected method "was due to a legally erroneous interpretation of the" statutory scheme "by staff at the time or simply bureaucratic rigidity is immaterial. The record consistently demonstrates that the only basis for {Commerce's} decision" to apply Bien Dong's rate to the separate companies was Commerce's belief that doing so followed the expected method. *See U.H.F.C. Co.*, 916 F.2d at 700. The Government and CASEAMEX's argument that the Court should nevertheless uphold Commerce's decision as "reasonable" on an alternative basis not stated in the record is "simply unavailing." *See Unisor Sacilor v. United States*, 893 F.Supp. 1112, 1137 (Ct. Int'l Trade 1995). Commerce "itself did not articulate such reasoning," and the court "cannot credit the Government's post-hoc rationalizations." *Dillinger France S.A. v. United States*, 589 F.Supp.3d 1252, 1262 (Ct. Int'l Trade 2022); *see also Ultratec, Inc. v. CaptionCall, LLC*, 872 F.3d 1267, 1274 (Fed. Cir. 2017) ("{W}e will uphold a decision of less than ideal clarity . . . but we may not supply a reasoned basis for the agency's decision that the agency itself has not given.").

For this reason alone, remand is required. *See Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 167 (1962) (the "requirements for administrative action" must be "strict and demanding" to ensure agency expertise does not "become a monster which rules with no practical limits on its discretion").

### B.     Using a Single Mandatory Respondent's Margin to Determine the Separate Rate Is In Any Event Unreasonable

The Government and CASEAMEX's argument that Commerce applied "any reasonable method" to determine the separate rate is, in any event, incorrect. Def. Resp. at 11. In essence, both assert that (1) the statutory framework assumes that "data from the largest volume exporters . . . can be viewed as representative of all exporters;" (2) Bien Dong accounts for [        ] of sales; and (3) Bien Dong's rate is thus presumptively representative of the separate rate companies.

*Id.* at 10-12 (internal quotations and citations omitted); CASEAMEX Resp. at 5-6. Both the Government and CASEAMEX overlook that the statutory presumption of representativeness does not attach based on the behavior of a single exporter, even if that exporter is large. *See YC Rubber Co. (N.A.) LLC v. United States*, 2022 WL 3711377 at *3-4 (Fed. Cir. Aug. 29, 2022) (concluding "that Commerce erred in relying on a single entity for calculation of a dumping margin for all respondents").

The cases cited by the Government to support its argument that Commerce reasonably relied on the rate calculated for a single mandatory respondent are inapposite. As an initial matter, none involved a situation in which there was only one mandatory respondent. Rather, they involved situations in which Commerce individually examined and determined margins for multiple respondents, *Albemarle Corp. & Subsidiaries v. United States*, 821 F.3d 1345, 1349 (Fed. Cir. 2016) (two mandatory respondents); *Changzhou Hawd Flooring Co. v. United States*, 848 F.3d 1006, 1009 (Fed. Cir. 2017) (three mandatory respondents); *Jiangsu Senmao Bamboo & Wood Indus. Co. v. United States*, 322 F.Supp.3d 1308, 1347 (Ct. Int'l Trade 2018) (two mandatory respondents).

Moreover, both *Albemarle* and *Chanzhou Hawd* arose from Commerce's refusal to apply the expected method to determine the separate rate, without making appropriate findings to justify a departure from that method. Here, in contrast, Commerce affirmatively determined that the expected method applied and that nothing in the record "justifies a departure from" it. IDM at 14. The Government (joined by CASEAMEX) now concedes that Commerce could not have meant what it said, because the "expected method" is infeasible when there is only one mandatory respondent. Def. Resp. at 9; CASEAMEX Resp. at 4. Neither *Albemarle* nor *Changzhou* support upholding an agency determination that rests on a logical impossibility.

As for *Jiangsu Senmao*, no decision either in favor of—or against—the expected method came into play. There, Commerce investigated two mandatory respondents. One received a zero rate; the other received a calculated, above-de minimis margin. The agency assigned this above-de minimis margin to the separate rate companies, citing "19 U.S.C. § 1673d(c)(5)(A), which sets forth a general rule under which Commerce is to base the all-others rate on 'the weighted average of the estimated weighted average dumping margins established for exporters and producers individually investigated, excluding any zero and de minimis'" or adverse facts margins. *Jiangsu Senmao*, 322 F.Supp.3d at 1346 (quoting 19 U.S.C. § 1673d(c)(5)(A)).

Further, while the U.S. Court of International Trade affirmed Commerce's decision on the basis that 19 U.S.C. § 1673d(c)(5)(A) permitted Commerce to "average" the single dumping that remained after exclusion of the zero margin to determine the all-others rate, *id.* at 1346-47, the court's rationale is called into serious question by *YC Rubber Co.* There, in analyzing how Commerce's review of a single mandatory respondent affected the separate rate in an administrative review, the U.S. Court of Appeals for the Federal Circuit ("CAFC") clarified that it is unreasonable for Commerce to "average" a single exporter's margin to derive a separate rate. *YC Rubber Co. (N.A.) LLC*, 2022 WL 3711377 at *4; *see also Jiangsu Senmao Bamboo and Wood Indus. Co. v. United States*, 769 F. Supp. 3d 1344, 1357-58 (Ct. Int'l Trade 2025) (characterizing *YC Rubber Co.* as having found that "the all-others rate {must} be based on the weighted average of . . . more than one" margin.) Accordingly, the Court should not rely on the 2018 *Jiangsu Senmao* decision to uphold Commerce's decision here.

Indeed, the logic of *YC Rubber Co.* demands remand. Here, Commerce justified its decision to use a single rate to determine the all-others rate on the grounds that doing so was consistent with the expected method and, thus, reasonable *per se*. IDM at 12-15. But *YC Rubber*

*Co.* confirms that in calling upon Commerce to determine the all-others rate based on an "average," Congress required that more than one data point be used in the creation of that average. *Id.* Commerce's decision to use a single rate to determine the all-others rate was thus neither in accordance with the expected method nor reasonable *per se. See id.*

The Government implies that *YC Rubber Co.* is inapposite because, while the plaintiffs there were dissatisfied with how the separate rate was determined, they attacked that rate by challenging Commerce's decision to proceed with a single mandatory respondent. *See* Def. Resp. 9, 12 n.5. This argument misses the mark. The question here is whether it was reasonable for Commerce to use only Bien Dong's margin to determine the rate for the separate rate companies. The CAFC's logic in *YC Rubber Co.* answers this question. The CAFC specifically considered 19 U.S.C. § 1673d(c)(5) in the context of the Tariff Act more broadly, and concluded that the provision generally requires a number "greater than one" to establish the all-other rate. *YC Rubber Co. (N.A.) LLC*, 2022 WL 3711377 at *4. The Court further concluded that "Commerce erred in relying on a single entity for calculation of a dumping margin for all respondents." *Id.* The same is true here. Commerce transgressed its statutory discretion by using *only* Bien Dong's rate to establish the dumping margin for all respondents.

**C.      Even If Using a Single Rate to Determine the All-Others Rate Could Theoretically Be Reasonable, It Was Not In These Circumstances**

Commerce arbitrarily and unreasonably decided that a single respondent's dumping margin reasonably reflects the likely dumping behavior of the separate rate companies. In the underlying investigation, CFA highlighted differences in cost, price, and operational structures that rendered the Bien Dong materially distinct from, and thus unrepresentative of, the non-investigated separate rate respondents, and which otherwise made it unreasonable to apply a 0% margin to them. Letter from Wiley Rein LLP to Sec'y Commerce, re: *Certain Frozen Fish Fillets from the Socialist*

*Republic of Vietnam: Case Brief* (Feb. 14, 2025) at 5-9, C.R. 472-473, P.R. 468 ("Case Br."). CFA asked Commerce to explore these issues and even compiled questions for Commerce to ask. *See id.* at 9 n.36. Commerce refused. Instead, the agency dismissed the record evidence regarding differences between Bien Dong and the separate rate companies, and the reasonableness of applying a $0.00/kg rate to the separate rate companies, with a series of a conclusory statements. In doing so, Commerce failed to discharge its statutory duty to adequately consider whether Bien Dong's 0% margin was reasonably reflective of the separate rate respondents' dumping. SAA, 1994 U.S.C.C.A.N. at 4201.

The defense's primary response to CFA's claims is that "Commerce directly considered these arguments and reasonably rejected them." Def. Resp. at 15; *see also* CASEAMEX Resp. at 7; NTSF Resp. at 1. The defense, however, does not meaningfully dispute that Commerce's response to CFA's arguments consisted of unsupported conclusions. *See* IDM at 14. These unsupported conclusions did not satisfy the statutory requirement that Commerce "examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n*, 463 U.S. 29 at 43 (quoting *Burlington Truck Lines, Inc.,* 371 U.S. 156 at 168).

First, regarding differences in the operations of the separate rate companies and those of Bien Dong, Commerce merely stated that it "disagree{d} that the record shows markedly different operations for all the separate rate companies . . . ." IDM at 14. Commerce did not identify any factual basis for its disagreement or provide any analysis. *Cf. Home Prods. Int'l, Inc. v. United States*, 837 F.Supp.2d 1294, 1303 (Ct. Int'l Trade 2012) ("The court, though, cannot evaluate the reasonableness of Commerce's decision-making reflected in one conclusory sentence in the Decision Memorandum." (emphasis omitted)); *see also Emerson Elec. Co. v. SIPCO, LLC*, 745

BUSINESS PROPRIETARY INFORMATION
HAS BEEN REMOVED

Ct. No. 25-00156                                                      NON-CONFIDENTIAL VERSION

F. App'x 369, 372 (Fed. Cir. 2018) (finding agency did not "adequately explain and support its conclusion" in "two conclusory sentences").  For example, CFA noted that Bien Dong [

], *see* Case Br. at 8, while CASEAMEX, Dai Thanh, HungCa 6, and Dong A did not report having affiliated U.S. entities or making sales to affiliated entities.  *Id.* at 8–9; *see also* Pl.'s Opening Br. at 14-15; *cf. Grobest & I-Mei Indus. (Vietnam) Co., Ltd. v. United States*, 815 F.Supp.2d 1342, 1354 (Ct. Int'l Trade 2012) ("Fine Foods, unlike the mandatory respondents in this review, is vertically integrated. This is sufficient reason for Commerce to determine that Fine Foods' production experience is less representative of respondents' production experience{.}" (quotation and alterations omitted)).

Commerce dismissed the non-selected respondents' [          ] lower U.S. prices with a similarly cursory statement: "while the petitioners performed a pricing analysis between certain of the separate rate applicants and the mandatory respondents, the proper metric in analyzing dumping behavior is comparing prices to normal value, and the record contains no such comparison."  IDM at 14.  But CFA—like Commerce itself in previous cases—compared the sales prices of the mandatory respondent and separate rate companies to assess the representativeness of the mandatory respondent's dumping margin.  *See, e.g., Green Farms Seafood Joint Stock Co. v. United States*, 2025 WL 1905115, at *2 (Ct. Int'l Trade July 10, 2025).  And as Commerce itself has reasoned, where separate rate companies' prices are "well below" those of an individually investigated company that receives a zero margin, those differences indicate that the zero margin is not reasonably reflective of the separate rate companies' likely dumping behavior.  *Id.*

Here, the separate rate companies' prices were [      ]% to [      ]% lower than those of Bien Dong, and thus were highly probative of different pricing behaviors, particularly where the separate rate companies are smaller than the mandatory respondent and attempting to gain a greater

foothold in the U.S. market. *See* Pl.'s Opening Br. at 14-15; *see also* Case Br. at 10, Exhibit 1B. Yet Commerce chose to ignore this evidence of pricing differences because the record—due to Commerce's refusal, further discussed below, to request the relevant information—did not contain specific evidence of the separate rate companies' normal values. For that matter, in waving away CFA's arguments, Commerce failed to recognize that lower U.S. prices are highly probative regarding differences in dumping margins in the nonmarket economy context, where normal value is typically based on factors of production rather than individual companies' home-market prices. *See* 19 U.S.C. § 1677b(c)(1).

The defense does not appear to contest that Commerce failed to meaningfully discuss the record evidence regarding pricing differences. *See generally* Def. Resp. at 15-20; *see also* CASEAMEX Resp. at 6-10; NTSF Resp. at 1. Instead, relying on *Pro-Team Coil Nail Enter. Inc. v. United States*, the Government claims that Commerce was not required to collect information relevant to the representativeness of Bien Dong's margin, because Commerce is "permitted, in fact, expected, to treat the mandatory respondents as representative of non-selected respondents." Def. Resp. at 15-16 (quoting *Pro-Team Coil Nail Enter. Inc. v. United States*, 587 F. Supp. 3d 1364, 1371 (Ct. Int'l Trade 2022)). Putting aside for the moment the fact that this presumption is inoperative where there is a single mandatory respondent, the defense ignores a crucial distinction between the situation here and that underlying *Pro-Team*. There, the parties that argued against the representativeness of the mandatory respondents were the separate rate companies. *Pro-Team*, 587 F. Supp. 3d at 1368. These parties were "in control of the information that would establish whether applying the expected method based on the rates of the mandatory respondents would not reasonably reflect the potential dumping margins of those non-selected respondents" and therefore bore the burden of providing that evidence to Commerce. *See id.* at 1371-72.

Here, Commerce erroneously shifted the burden to the domestic industry to provide information that it had no control of, and which only Commerce could compel from those that did. And while CFA urged Commerce to collect that information, the agency ignored the request. *See* Letter from Wiley Rein LLP to Sec'y Commerce, re: *Certain Frozen Fish Fillets from the Socialist Republic of Vietnam: Request for Additional Information from Companies Seeking Separate Rate Treatment* (June 3, 2024), C.R. 280, P.R. 287. Then, when CFA highlighted record evidence showing that non-selected respondents' U.S. prices were far below the mandatory respondents' prices, Commerce dismissed that evidence because the record did not also contain the very information that Commerce refused to collect. *See* IDM at 14-15. Principles of fairness demand that Commerce cannot ground its decision in the lack of data that CFA could not provide and that Commerce refused even to seek. *See, e.g., Albemarle*, 821 F.3d at 1358.

Additionally, and as alluded to above, *Pro-Team*'s discussion of the "representativeness" of the mandatory respondents' margins occurred against the backdrop of the expected method. Specifically, the Court in *Pro-Team* only agreed that Commerce was not required to seek additional information regarding the mandatory respondents' representativeness after upholding the agency's use of the expected method. *See Pro-Team*, 587 F. Supp. 3d at 1375. Here, however, the defense concedes that Commerce's separate rate determination was not based on the expected method. *See* Def. Resp. at 9-10. Neither the defense nor Commerce can hide behind any presumption that mandator respondents' margins are treated as representative under the expected method where the expected method was not used.

For its part, defendant-intervenor CASEAMEX focuses on the issue of "contemporaneity." CASEAMEX Resp. at 7-9.[2]  According to CASEAMEX, "the law evinces a strong preference for using the most contemporaneous rates." *Id.* at 8.  However, any consideration of contemporaneity cannot override the requirement that Commerce calculate dumping margins as accurately as possible. *See Rhone Poulenc, Inc. v. United States*, 899 F.2d 1185, 1191 (Fed. Cir. 1990) ("The agency's presumption implements the basic purpose of the statute—determining current margins as accurately as possible.").  Indeed, while CASEAMEX relies on *Navneet Publications (India) Ltd. v. United States* in advancing its argument, the Court there was explicit that "Commerce's overriding purpose in administering antidumping law is to accurately calculate dumping margins." 999 F. Supp. 2d 1354, 1362 (citing *Yangzou Bestpak Gifts & Crafts Co. v. United States*, 716 F.3d 1370, 1379 (Fed. Cir. 2013)).

And contrary to CASEAMEX's claims, the *Navneet Publications* Court did not elevate contemporaneity over other considerations or establish a principle that it is "more appropriate to look to currently calculated rates." *See id.* at 1364-66; *see also* CASEAMEX Resp. at 8.  Rather, in evaluating the reasonableness of the all-others rate in the administrative review under appeal, the Court began with a historical analysis of prior all-others rates (*i.e.*, non-contemporaneous rates) in the proceeding. *Navneet Publications*, 999 F. Supp. 2d at 1364-66.  Based on this analysis, it found that the 11.01% all-others rate determined in the review was aberrational when compared to historical all-others rates ranging from 1.22% to 3.05%.  Only after finding that the all-others rate that Commerce selected was historically aberrational did the court discuss the relationship between the all-others rate and contemporaneous data.  And crucially, it did so by finding that there was no

---

[2]    Again, CASEAMEX was a mandatory respondent in the immediately preceding review, and received a calculated rate of $0.18/kg.  It is obvious why CASEAMEX prefers the contemporaneous 0% margin determined for rate over an accurate one.

contemporaneous evidence of differences in pricing practices between the mandatory respondents and non-selected respondents that would support application of a historically high all-others rate. *Id.* at 1365. Here, of course, Commerce dismissed this type of price comparison out of hand despite both the courts and the agency itself having relied on it in the past. *See* discussion *supra* at 10-12. Simply put, CASEAMEX cannot plausibly rely on a case that underscores the flaws in Commerce's decision here as support for that decision. And even if Commerce could elevate contemporaneity over accuracy as a general matter in determining a separate rate, this would not absolve Commerce of its failure to address CFA's arguments regarding differences in pricing, costs, and operations—or the associated record evidence that detracted from its conclusion.

Finally, CFA argued below and reiterated in its Opening Brief that the historical rates in this proceeding further highlight the unreasonable nature of Commerce's decision to apply a zero percent rate to the separate rate respondents. Case Br. at 11–14; Pl.'s Opening Br. at 17-20; cf. *Bosun Tools Co. v. United States*, 2022 WL 94172, at *4–6 (Fed. Cir. Jan. 10, 2022) (relying on historical rates to evaluate whether a 0% margin was reflective of separate rate companies' likely dumping behavior). In the nineteen administrative reviews that preceded the one at bar, Commerce only determined a 0% separate rate once, in the sixteenth review. *See* Pl.'s Opening Br. at 18-19. Separate rates below $0.18/kg are historically uncommon.[3] *Id.* Indeed, CASEAMEX received a $0.18kg calculated margin as a mandatory respondent in the immediately preceding review, a fact

---

[3]    Notably, since CFA filed its opening brief, Commerce has applied a preliminary separate rate of $0.23 per-kilogram to CASEAMEX and Navico in the 2023-2024 administrative review. *See Certain Frozen Fish Fillets from the Socialist Republic of Vietnam*, 91 Fed. Reg. 6192, 6194 (Dep't Commerce Feb. 11, 2026) (prelim. results of antidumping duty admin. rev.; prelim. recission of admin. rev.; and recission of admin. rev., in part; 2023–2024). Bien Dong received a preliminary rate of $0.29 per-kilogram. *Id.*

which Commerce ignored.[4]  *See* Def. Resp. at 19; *Certain Frozen Fish Fillets From the Socialist Republic of Vietnam*, 89 Fed. Reg. 18,595 (Dep't Commerce Mar. 14, 2024) (final results and partial rescission of admin. rev.; 2021-2022).  In any event, the overall history of the order indicates that a $0.00/kg rate is anomalous as applied to separate rate companies, and unlikely to reflect typical rates of dumping for such entities.  As such, the order's long history of above-*de minimis* separate rates far outweighs any sporadic zero or *de minimis* separate rates that the defense cites.  *See* Def. Resp. at 22.

This history of dumping, as well as meaningful differences in prices and business operations between the separate rate companies and Bien Dong, severely undermine Commerce's rote application of Bien Dong's $0.00/kg to the separate rate respondents.  Commerce failed to meaningfully engage with CFA's arguments and the record evidence, contrary to its obligation to provide reasoned explanations of its final decision.  *See, e.g.*, *Fine Furniture (Shanghai) Ltd. v. United States*, 182 F. Supp. 3d 1350, 1371 (Ct. Int'l Trade 2016), order clarified, 39 ITRD 1672 (Ct. Int'l Trade 2017) ("{W}hen a party properly raises an argument before an agency, that agency is required to address the argument in its final decision." (citing *SKF USA Inc. v. United States*, 630 F.3d 1365, 1374 (Fed. Cir. 2011))).  A remand is necessary for Commerce to address CFA's arguments, and otherwise meaningfully address the record evidence that Bien Dong's calculated rate does not reasonably reflect the separate-rate respondents' level of dumping.

---

[4]    Commerce recently corrected a ministerial error affecting CASEAMEX's margin in the immediately preceding review, raising it from $0.18/kg to $0.20/kg. *See* Redetermination Pursuant to Cour Remand Order, *Catfish Farmers of America, et al., v. United States* (Apr. 15, 2026), Ct No. 24-00082, ECF 54, at 35-36.

## III.    CONCLUSION

For the reasons discussed above and in CFA's opening brief, CFA respectfully submit that the Court should remand Commerce's final results in the 2022-2023 administrative review of the Order for further consideration.

Respectfully submitted,

*/s/ Nazak Nikakhtar*
Nazak Nikakhtar, Esq.
Stephanie M. Bell, Esq.
John Allen Riggins, Esq.

WILEY REIN LLP
2050 M Street, NW
Washington, DC 20036
(202) 719-7000

*Counsel to Catfish Farmers
of America, et al.*

Dated: May 15, 2026

## CERTIFICATE OF COMPLIANCE

Pursuant to Chamber Procedure 2(B)(1), the undersigned certifies that this brief complies with the word limitation requirement. The word count for Reply Brief of Plaintiffs, Catfish Farmers of America, *et al.*, as computed by Wiley Rein LLP's word processing system (Microsoft Word 2021), is 4,784 words.

*/s/ Nazak Nikakhtar*
(Signature of Attorney)

Nazak Nikakhtar
(Name of Attorney)

Catfish Farmers of America and individual U.S. catfish processors America's Catch, Inc., Alabama Catfish, LLC d/b/a Harvest Select Catfish, Inc., Consolidated Catfish Companies, LLC d/b/a Country Select Catfish, Delta Pride Catfish, Inc., Guidry's Catfish, Inc., Heartland Catfish Company, Magnolia Processing, Inc. d/b/a Pride of the Pond, and Simmons Farm Raised Catfish, Inc.
(Representative Of)

May 15, 2026
(Date)